UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO VELASQUEZ, | No. 1:15-cv-01288-AWI-JLT (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| STU SHERMAN, | **[TWENTY-ONE DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation serving a sentence of 33 years plus 15 years-to-life for his conviction of attempted murder of a peace officer, assault on a peace officer with a semiautomatic weapon, shooting from a motor vehicle, and ten counts of robbery. He is represented in this action by Clifford Gardner, Esq., and Rudolph Alejo, Esq. In this action, Petitioner presents multiple challenges to his conviction. The Court finds that the state court rejections of his claims were not contrary to, or an unreasonable application of, Supreme Court precedent and recommends the petition be **DENIED.**

**I.      PROCEDURAL HISTORY**

On August 17, 2011, Petitioner was convicted in the Tulare County Superior Court of attempted murder of a peace officer (Cal. Penal Code §§ 664, 187(a), count 1); assault on a peace officer with a semiautomatic firearm (Cal. Penal Code § 245(d)(2), count 2); shooting from a motor vehicle (Cal. Penal Code § 12034(c), count 8); and ten counts of second degree robbery

1  (Cal. Penal Code § 211, counts 3–7, 9–13).  <u>People v. Velasquez</u>, No. F063254, 2013 WL

2  173190, at *1 (Cal. Ct. App. Jan. 16, 2013).  Allegations were found true that the attempted

3  murder was committed willfully, deliberately, and with premeditation, that Petitioner personally

4  discharged a firearm, and that in committing the robbery counts, he personally used a firearm.  <u>Id</u>.

5  The trial court sentenced him to a total prison term of 33 years, plus a consecutive term of 15

6  years to life.  <u>Id</u>.

7        Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

8  DCA"), raising a claim of insufficiency of the evidence.  (LD[1] 12.)  On January 16, 2013, the

9  Fifth DCA issued its opinion affirming the judgment.  <u>Velasquez</u>, 2013 WL 173190, at *1.  On

10  February 19, 2013, Petitioner filed a petition for review in the California Supreme Court.  (LD

11  16.)  The California Supreme Court denied the petition without comment on March 27, 2013. (LD

12  17.)

13        Petitioner next filed a habeas petition in the Tulare County Superior Court on June 20,

14  2014, raising six new claims for relief.  (LD 18.)  The superior court denied the petition in a

15  reasoned decision on June 26, 2014.  (LD 19.)  On August 18, 2014, Petitioner filed a habeas

16  petition in the Fifth DCA.  (LD 20.)  The petition was summarily denied without comment on

17  October 6, 2014.  (LD 21.)  On December 9, 2014, he filed a habeas petition in the California

18  Supreme Court.  (LD 22.)  The California Supreme Court summarily denied the petition without

19  comment on February 17, 2016.  (LD 26.)

20        On August 21, 2016, Petitioner filed the instant petition for writ of habeas corpus in this

21  Court.  (Doc. No. 1.)  Respondent filed an answer on December 9, 2016.  (Doc. No. 23.)

22  Petitioner filed a traverse to Respondent's answer on April 7, 2017.  (Doc. No. 33.)

23  **II.    FACTUAL BACKGROUND**

24        The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[2]

25        Shortly after midnight on October 3, 2009, four Hispanic young men entered a bar
       and grill in Tulare; at least two had guns and all wore masks. Gunshots were fired
26

---

[1] "LD" refers to the documents lodged by Respondent.
[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
Therefore, the Court will rely on the Fifth DCA's summary of the facts.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir.
2009).

into the ceiling and the men threatened patrons, pointed guns at their heads and ordered them around. Some patrons dropped to the floor while others ran for cover. One patron ran out through a door and called the police. Inside, the men robbed patrons at gunpoint of wallets, jewelry and other possessions, and took about $1,200 from the cash register. The robbers fled the bar and drove away in two vehicles. Two of them got into a gray sports utility vehicle (SUV), while the other two got into a smaller car.

Tulare Police Officer Justin Rich, who was alone in his marked patrol unit, followed the SUV after he saw it about a half mile from the bar. The SUV was quite a few car lengths ahead, so Rich accelerated to approximately 60 miles per hour to try to catch up and initiate a traffic stop. As Rich was closing in on the SUV, he activated his overhead lights and siren, but the SUV failed to yield and instead accelerated away from Rich, who continued the pursuit.

After going around a curve in the road, the SUV abruptly stopped in the middle of the road. Rich slammed on his brakes to avoid hitting the SUV and came to a stop about 20 feet directly behind it. The rear passenger-side door of the SUV started to crack open. At the same time, Velasquez stood up inside the SUV and emerged from the open sunroof. Velasquez, who was visible from the waist up, was holding a black handgun, which he pointed directly at Rich. Without hesitation, Velasquez began shooting in a downward direction, firing a total of five or six shots. Rich heard two shots hit the patrol car. As soon as he realized Velasquez was shooting at him, he turned to the left and accelerated into a U-turn. As Rich did so, he continued to look at Velasquez, who was still firing at him. After completing the U-turn, Rich looked back to his left and saw the SUV accelerate away. Rich radioed for assistance as he made another U-turn and resumed the pursuit. Rich, however, smelled smoke and thought the car was shaking, so he stopped while other officers took over the pursuit.

The officers lost sight of the SUV. An hour or so later, officers found the abandoned SUV parked against a fence in a residential area. Inside officers found property belonging to some of the robbery victims, a shotgun, a spent .380–caliber casing, live .380–caliber rounds and live Winchester shotgun shells. At the scene of the shooting at Rich, officers found six expended .45–caliber shells and a black ski mask on the road. The patrol car was hit twice in the front, as shown by bullet holes in the following places: (1) in the front bumper on the bottom part of the grill, just above the license plate; and (2) in the middle of where the hood meets the front portion of the vehicle and closes onto the frame. There was also a bullet hole on the lower portion of the front passenger door. A bullet was found in the engine compartment and bullet fragments were found in the middle area of the lower front passenger door panel.

At around 4:30 that morning, officers found Velasquez hiding in a garbage can with a wad of cash in his pocket and a cell phone in his hand. A loaded .380–caliber automatic pistol was found inside the garbage can. In an interview at the police station, Velasquez admitted he possessed guns and that the robbery was his idea, but denied shooting at Rich. Velasquez refused to name the shooter. Velasquez also said he was driving the SUV when Rich was chasing him, and admitted seeing the patrol car's lights. He did not stop because he panicked and was scared.

Velasquez, 2013 WL 173190, at *1–2.

**III. DISCUSSION**

A. _Jurisdiction_

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B. _Legal Standard of Review_

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

4

an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

1    C.    Review of Petition

2         The instant petition presents the following grounds for relief: 1) The prosecutor violated

3    Petitioner's due process rights by suppressing exculpatory fingerprint evidence; 2) Trial counsel

4    was ineffective in failing to introduce the results of the fingerprint tests; 3) Trial counsel was

5    ineffective when he moved to suppress Petitioner's confession but failed to present evidence

6    showing he had been beaten just prior to the interrogation; 4) Trial counsel failed to introduce

7    evidence that Adan Fernandez repeatedly admitted to shooting at Officer Rich; 5) The prosecutor

8    committed misconduct by introducing false evidence from two witnesses; 6) The state court

9    unreasonably determined that sufficient evidence supported Petitioner's attempted murder

10   conviction; and 7) The cumulative effect of the alleged errors denied Petitioner due process and a

11   fair trial.

12         1.   Claim One – Failure to Disclose Fingerprint Evidence

13         Petitioner first challenges the state court's denial of his claim that the prosecutor

14   committed a violation under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose the

15   results of the tests conducted on the fingerprint evidence recovered from the Jeep.  In the last

16   reasoned decision, the state superior court rejected the claim as follows:

17         Petitioner's claims for the most part are conclusory and speculative and thus
           fail to state a prima facie claim for relief.  (In re Swain (1949) 34 Cal. 2d 300, 304,
18         cert. denied (1950) 338 U.S. 994).  Petitioner claims that the finger print analysis
           from the Jeep would be exculpatory.  However, such a claim is based not on
19         evidence, but speculation.

20   (LD 19.)

21         Respondent contends that the citation to In re Swain constitutes a decision on the merits

22   entitled to AEDPA deference.  Petitioner disputes this and argues that AEDPA deference is not

23   warranted.  The Court agrees with Petitioner.  The superior court's citation to Swain indicates that

24   its decision was not an adjudication on the merits, but rather a denial of relief without prejudice to

25   Petitioner filing a new petition that sets forth the operative facts with particularity.  See Cross v.

26   Sisto, 676 F.3d 1172, 1177 (9th Cir. 2012); Gaston v. Palmer, 417 F.3d 1030, 1038–39 (9th Cir.

27   2005) ("In light of the citations to Swain and Duvall, we read the California Supreme Court's

28   denial of [petitioner's] ... habeas application as, in effect, the grant of a demurrer.... [The]

application was thus procedurally deficient under California law."), *modified on other grounds by* 447 F.3d 1165 (9th Cir. 2006).  Because Petitioner did not refile the claim in the superior court, he may not have exhausted his state remedies.  Nevertheless, because the claim plainly lacks merit, the Court will recommend exercising its discretion to deny relief following a *de novo* review.  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

      a.    Legal Standard

Due process requires that the prosecution disclose exculpatory evidence within its possession.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Cooper v. Brown, 510 F.3d 870, 924 (9th Cir. 2007).  This obligation encompasses the duty to discover and produce favorable evidence known to others acting on the government's behalf in the case, such as other agencies involved in the investigation or prosecution of the defendant.  Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Zuno–Arce, 44 F.3d 1420, 1427 (9th Cir. 1995).

There are three components of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281–82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).  The third element, prejudice, is also described as materiality.  See Benn v. Lambert, 283 F.3d 1040, 1053 n. 9 (9th Cir. 2002) (explaining that, "for Brady purposes, the two terms have come to have the same meaning").  Evidence is material under Brady if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433–34 (internal quotation marks and citation omitted).

      b.    Analysis

In several discovery requests prior to trial, Petitioner requested, *inter alia*, the following items: "[a]ll relevant real evidence seized or obtained as a part of the investigation"; "all physical evidence and lab test analyses"; "[a]ll fingerprint, footprint and tire print analyses"; "fingerprint rpts"; "[i]nspection of all physical evidence"; "[a]ll laboratory, technicians and other reports concerning the testing and examination of said physical evidence. Copies of the lab analysis

and/or results"; and "the results of physical or mental examinations, scientific tests, experiments, and comparisons, which [the prosecution] intend[s] to offer in evidence at the trial." (LD 22, Ex. E.)

As to these specific requests, the prosecution responded that "[a]ll relevant real evidence seized may be seen at the office of the arresting police agencies" and "[p]ursuant to [the defense's] request we will set an evidence viewing at the Tulare Police Department at the convenience of the parties." (LD 22, Ex. F.) As to any fingerprint analyses and reports, and any lab test analyses, the prosecution responded that "the People have requested any such analyses that have been performed though the People are unaware of any results for any lab analyses tests." (LD 22, Ex. F.) The prosecution further stated that "[i]f and when any results become known, the People will provide them upon receipt." (LD 22, Ex. F.)

Petitioner claims that based on a police report that stated that fingerprints had been lifted from the vehicle and were "pending CAL ID processing," the prosecution withheld exculpatory evidence. (LD 22, Exs. D, N.) However, there is no indication that the fingerprints were ever tested, let alone that the prosecution received and withheld them. As pointed out by Respondent, the fact that fingerprint cards were submitted does not mean that they were tested and provided to the prosecution. As noted above, the prosecution stated it was unaware of the results of any tests. The evidence technician testified that he had located and lifted fingerprint evidence from the vehicle. (LD 7 at 211-212.) However, he stated that as far as he knew they were not submitted to the California Department of Justice. (LD 7 at 212.) He further testified that customarily the defense would also request that certain evidence be tested, but in this case, he was unaware of any request from the defense to have the prints tested. (LD 7 at 218.) Moreover, according to the prosecution's responses to the defense's discovery requests, the fingerprint cards were made available to the parties for inspection. (LD 22, Exs. F, G.) Therefore, had the defense felt the prints were necessary or had the defense been unsatisfied with the prosecution's response, it could have made a request to have the prints tested or filed a motion to compel disclosure. Cal. Penal Code § 1054.5.

Furthermore, Petitioner fails to show that the fingerprints were exculpatory. The

8

fingerprint cards do not state from where on the vehicle the prints were taken. Petitioner alleges that they came from the roof of the vehicle and would have been evidence of another shooter, but as found by the state court, this is only speculation. (LD 19.)

Thus, Petitioner fails to establish a <u>Brady</u> violation. He fails to demonstrate that exculpatory evidence existed, that it was withheld by the prosecution, and that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles</u>, 514 U.S. at 433–34. The claim should be denied.

2. <u>Claim Two, Three, Four – Ineffective Assistance of Counsel</u>

In his next three claims, Petitioner alleges defense counsel rendered ineffective assistance in several ways. He claims defense counsel failed to introduce the results of the fingerprint tests, failed to present evidence showing he had been beaten just prior to the interrogation, and failed to introduce evidence that Adan Fernandez repeatedly admitted to shooting at Officer Rich. Petitioner raised these claims on habeas review in the Tulare County Superior Court, California Court of Appeal, and California Supreme Court. In the last reasoned decision, the superior court denied the claims on the merits by finding that Petitioner failed to show a *prima facie* case for relief, by stating he had "failed to establish the basic requirements for success." (LD 19.) <u>See also</u> <u>Phelps v. Alameida</u>, 569 F.3d 1120, 1126 n. 8 (9th Cir. 2009) (state court denial of habeas petition upon finding that it failed to make a prima facie case "is a denial on the merits of the claim"). The California Court of Appeal and California Supreme Court denied the petitions without comment or citation to authority. Consequently, the Court "looks through" the silent denials to the last reasoned decision of the Tulare County Superior Court as the basis for the state court's judgment. <u>Williams</u>, 646 F.3d at 635.

a. <u>Legal Standard</u>

Because the superior court concluded that Petitioner failed to show a prima facie case for relief, this Court will "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." <u>Haney v. Adams</u>, 641 F.3d 1168, 1171 (9th Cir. 2011) (internal quotation marks omitted). "This is not *de novo* review of the constitutional issue, but only a means to determine whether the state court decision is objectively unreasonable." <u>Id</u>.

The deferential standard of review under AEDPA applies to Grounds Two through Four.  See Richter, 562 U.S. at 98 ("the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief").

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

1  state court has even more latitude to reasonably determine that a defendant has not satisfied that

2  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

3  application was unreasonable requires considering the rule's specificity.  The more general the

4  rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

5  　　　As to all of the claimed instances of ineffective assistance, the state court applied the

6  correct federal standard, i.e., Strickland, to Petitioner's contentions regarding counsel's

7  performance.  Hence, the only question is whether, having applied the correct test, the state

8  court's application of Strickland was objectively unreasonable.  Schriro v. Landrigan, 550 U.S.

9  465, 473 (2007).

10  　　　b.  Analysis – Failure to Introduce Results of Fingerprint Tests

11  　　　Petitioner alleges that defense counsel failed to obtain and present the fingerprint evidence

12  taken from the Jeep, or present a fingerprint expert to testify.

13  　　　This claim fails for several reasons.  First, as previously discussed, there is no indication

14  that the fingerprints were tested, and there is conflicting evidence on whether the fingerprint cards

15  were even submitted.  From this, a fairminded jurist could reasonably conclude that defense

16  counsel did not obtain fingerprint evidence because such evidence did not exist or he reasonably

17  believed that such evidence did not exist.  Thus, Petitioner fails to show that defense counsel was

18  deficient.  For the same reasons, Petitioner's claim that defense counsel should have obtained a

19  fingerprint expert fails.  There is no need for an expert to testify regarding evidence that did not

20  exist.

21  　　　Petitioner's assertion that counsel should have obtained an expert to test the eighteen

22  fingerprint cards also fails.  "Under § 2254(d), a habeas court must determine what arguments or

23  theories supported or, as here, could have supported, the state court's decision; and then it must

24  ask whether it is possible fairminded jurists could disagree that those arguments or theories are

25  inconsistent with the holding in a prior decision of this Court."  Richter, 562 U.S. at 102.  As

26  noted by Respondent, the fingerprint cards were available for viewing by the defense.  It is

27  possible counsel viewed the cards with the prosecution and determined they were unusable.  It is

28  also possible counsel may have concluded that the prints would not have helped the defense since

11

they were not taken from the roof of the vehicle. Also, counsel may have known from discussions with his client that his prints were on the roof, and therefore made a tactical decision not to pursue the evidence and further prove the prosecution's case. Thus, Petitioner has not shown the state court rejection of the claim to be unreasonable.

Even if counsel were deficient in his representation, Petitioner has failed to establish prejudice, which is fatal to his claim. See Hein v. Sullivan, 601 F.3d 897, 918 (9th Cir. 2010) ("As [petitioner] must satisfy both [deficiency and prejudice] prongs in order to prevail under Strickland, we may dispose of his claim if he fails to satisfy either prong of the two-part test."); Sangathe v. Maass, 314 F.3d 371, 380–81 (9th Cir. 2002) ("We need not consider whether trial counsel's investigation of this issue was deficient, however, because this argument fails at the prejudice prong of Strickland." ). To establish prejudice, Petitioner must show that "it is 'reasonably likely' the result [at trial] would have been different." Richter, 562 U.S. at 111. Here, it is mere speculation that fingerprint test results existed or that those results indicated that someone other than Petitioner was the shooter. Thus, he fails to show that it was reasonably likely the result would have been different. The claim should be rejected.

c.  Analysis – Failure to Introduce Officer Kelly's Report

Petitioner next argues that defense counsel rendered ineffective assistance by failing to introduce Officer Kelly's report and demonstrate that Petitioner had been beaten before his interview with officers. He alleges that Officer Kelly's report would have corroborated his claim that officers beat him into submission upon his arrest.

i.  *Factual Background*

According to his report, Kelly responded to the scene where Petitioner was located in a trash can. (LD 22, Ex. H.) He was assisting the SWAT team in search of suspects when he heard Officer Franklin advising Petitioner who was hiding inside a trash can to show his hands. (LD 22, Ex. H.) After Petitioner stood up, he was instructed to get out of the trash can and get onto the ground. (LD 22, Ex. H.) He refused multiple commands to do so and was thereafter taken to the ground. (LD 22, Ex. H.) As Petitioner went to the ground, he continued to resist and Officer Kelly assisted by grabbing Petitioner's left shoulder and forcing him down. (LD 22, Ex. H.)

Once on the ground, Petitioner refused to go completely to the ground and remove his hands from underneath him. (LD 22, Ex. H.) At this point, Officer Kelly used his right boot to force Petitioner all the way to the ground while simultaneously ordering him to place his arms behinds his back. (LD 22, Ex. H.) Once Petitioner was all the way to the ground, Officer Franklin was able to secure him with handcuffs. (LD 22, Ex. H.) Later, he assisted Petitioner to his feet and escorted him to the sidewalk where he was released to Tulare Police Officer Lopez. (LD 22, Ex. H.)

Petitioner was later transported to the county jail. (LD 2 at 307.) He was read his Miranda rights and agreed to speak with investigators. (LD 2 at 307-308.) Petitioner made several admissions including having participated in the robberies, driving the suspect vehicle, being in the vehicle when shots were fired at the officer, owning the handgun found in the trashcan, and owning the shotgun found in the vehicle. (LD 2 at 307-345.) He denied he was the shooter and refused to provide the officers with the names of the other suspects. (LD 2 at 321-23, 326, 345.)

Prior to trial, Petitioner moved to suppress his confession as involuntary due to coercion by means of physical and psychological mistreatment. (LD at 98-103.) At the hearing on the motion, Petitioner stated that when he was arrested, officers threw him to the ground. (LD 5 at 18.) When he was kneeling, an officer placed his boot on his back and pushed him to the ground causing his lips to crack and his teeth to be pushed inward. (LD 5 at 18.) He stated that after he was arrested he was hit. (LD 5 at 19.) Thereafter, he was taken into custody and transported to the police station where he was interviewed. (LD 5 at 19-20.) He claimed he gave his statement because he was afraid that the officers "would hit [him] and . . . continue telling [him] things." (LD 5 at 21.) Petitioner acknowledged he did not receive medical attention for his injuries. (LD 5 at 24.)

One of the investigating officers, Detective Haney, also testified. (LD 22, Ex. N.) He stated that no one had spoken to Petitioner prior to the recorded interview aside from introducing themselves and offering Petitioner a beverage. (LD 22, Ex. N.) Haney stated that Petitioner was mad because he felt he had been treated a little rough when he was taken out of the trash can, but

13

he did not mention any injuries and there were no signs of any injuries. (LD 22, Ex. N.)

The trial court considered the video evidence and the transcript of the interview. (LD 22, Ex. N.) The court found no evidence in the video showing any injuries to the petitioner. (LD 22, Ex. N.) The court further noted that there was no evidence that the petitioner had any difficulty in understanding the questions. (LD 22, Ex. N.) The court noted that there was no evidence of intoxication despite Petitioner's almost unbelievable claim of having consumed up to 25 beers prior to being apprehended. (LD 22, Ex. N.) However, the court noted that at one point in the interview, the officers took an aggressive posture and began accusing him of not caring for his family. (LD 22, Ex. N.) Based on its review of the interview, the court excluded the petitioner's statements from the point the officers changed their tone and became aggressive and accusatory. (LD 22, Ex. N.) The court did not exclude the earlier part of the statement where Petitioner had admitted to possessing a firearm, participating in the robberies, and being in the SUV when shots were fired at the pursuing officer. (LD 22, Ex. N.)

  ii.    *AEDPA Deference*

Petitioner argues that this claim does not merit AEPDA deference because the superior court stated, "The issue as to the admission of Petitioner's confession at trial was litigated at the trial level and not raised on appeal." (LD 19.) This statement came two paragraphs before the state court addressed his ineffective assistance of counsel claims. (LD 19.) He claims this statement showed the state court procedurally denied his claim and therefore did not adjudicate it on the merits. As noted by the parties, California law precludes habeas relief for issues that could have been raised on appeal but were not. In re Dixon, 41 Cal.2d 756 (1953). The Dixon bar, however, does not apply to ineffective assistance of counsel claims. In re Robbins, 18 Cal.4th 770, 814, n. 34 (1998). It is unclear whether the superior court intended to apply the Dixon bar to this ineffective assistance of counsel claim. Under California law, such a bar would have been inappropriate. In any case, two paragraphs later the state court did reject the claim under Strickland. (LD 19.) Therefore, at most, the state court rejected the claim alternatively on procedural grounds and on the merits. In such a case, AEDPA deference applies. Clabourne v. Ryan, 745 F.3d 362, 383 (9th Cir. 2014), *overruled on other grounds by* McKinney v. Ryan, 813

F.3d 798 (9th Cir. 2015) (en banc); Rolan v. Coleman, 680 F.3d 311, 319 (3d Cir. 2012); Hoffner v. Bradshaw, 622 F.3d 487, 505 (6th Cir. 2010), *cert. denied*, 2011 WL 743055 (2011).

### iii.    Analysis

Upon review of the record, a fairminded jurist could have determined that defense counsel rationally decided not to introduce Officer Kelly's report. The report corroborated Petitioner's statement that an officer used his boot to push him to the ground. However, the report provided no evidence that a beating occurred or that the force used was excessive to the circumstances. Introducing the report would only have reaffirmed that Petitioner resisted the officers and that any injuries sustained by Petitioner were the result of his own noncompliance. The report also provided no evidence of any physical injuries sustained by Petitioner. Thus, counsel could have opted not to introduce the report in order to avoid confirming that Petitioner resisted arrest, that he suffered no visible injuries, and that any possible injuries that occurred resulted from his noncompliance. Accordingly, Petitioner fails to show that the state court rejection was unreasonable.

Moreover, Petitioner fails to establish any prejudice. In light of what was contained in the report, there is no reasonable likelihood that the court would have altered its ruling and excluded the confession. The report provided no further evidence to support Petitioner's allegations, other than the officer's use of his boot to subdue Petitioner while he was resisting, and the report would have only confirmed the court's determination that the confession was not coerced. The trial court had viewed the entirety of the interview and determined that Petitioner was not subjected to any physical or psychological coercion up to the point the officers took an aggressive tone. The report would not have altered that determination. In fact, the report would only have confirmed that officers acted reasonably in trying to subdue a resisting suspect.

Further, even if Petitioner had been successful in excluding the interview, there is no reasonable likelihood that the outcome of the trial would have been different. The evidence of Petitioner's guilt was overwhelming. The officer who was shot at readily identified Petitioner as the shooter. The officer had a clear and relatively close view of Petitioner's face as he repeatedly fired his weapon directly at the officer. (LD 8 at 275, 278, 292-93, 309-10.) The officer stated

that he stared right at Petitioner and his eyes never left him even as he attempted to evade the shots. (LD 8 at 278-79.) The physical evidence also directly connected Petitioner to the crime. Petitioner was found with a handgun of the same caliber as found in the suspect vehicle, a "wad" of cash, a wallet of one of the robbery victims, and a shotgun shell similar to those found in the vehicle. (LD 7 at 179-85, 200; LD 8 at 239-42.) Based on the evidence introduced at trial, a reasonable jurist could have found no reasonable likelihood that the jury would have acquitted him of the charges had the confession been excluded. Therefore, the claim should be rejected.

### d. Analysis – Failure to Investigate Third Party

In his final claim of ineffective assistance of counsel, Petitioner alleges that counsel failed to investigate and introduce evidence of Adan Fernandez as the individual who shot at the officer. Petitioner states he advised defense counsel that Adan Fernandez, who was deceased, had admitted to others that he committed the shooting. He states counsel told him nothing could be done because Fernandez was already dead. Petitioner argues that counsel should have investigated, and if he had done so, he would have uncovered witnesses who would have testified to Fernandez's statements admitting to the shooting.

Counsel's strategy at trial was to concede that the robbery occurred but that Petitioner was not the shooter, or alternatively, that Petitioner did not attempt to kill Officer Rich. Counsel's approach was to attack the eyewitness testimony of Officer Rich. In addition, counsel argued that there was a lack of physical evidence showing Petitioner was the shooter.

Petitioner presented this argument on state habeas review. In support, Petitioner submitted several declarations from purported witnesses who were friends or relatives of Fernandez and who claimed that Fernandez had admitted to them on multiple occasions that he had been involved in a robbery, was chased by police, and shot at a police officer. (LD 22, Exs. J-L.) Each stated that counsel had not contacted them but they would have testified had they been called. (LD 22, Exs. J-L.) The state court rejected this claim on the merits by citing to Strickland as noted above. Therefore, AEDPA deference applies.

Respondent argues that Petitioner only advised defense counsel that someone who was now deceased committed the crime. Respondent states Petitioner did not advise counsel that

there were other individuals who were witness to Fernandez's statements, and argues that counsel cannot be faulted for failing to investigate when Fernandez was already deceased. The Court does not agree. Arguably, a reasonable attorney would have conducted at least some investigation into whether someone else had admitted to the crime, especially since that was the petitioner's defense strategy. Minimal investigation into Fernandez would surely have revealed these individuals who were immediate friends and relatives of Fernandez.

Respondent further contends that there were rational, tactical reasons for counsel not to investigate and pursue a strategy of blaming Fernandez. Respondent notes that Petitioner did not come forward with this information for approximately two years, from his arrest in 2009 to his trial in 2011. During investigations, Petitioner had steadfastly refused to provide the identity of the individual who he claims actually committed the shooting. With this extended silence and then coming forward with the claim on the eve of trial, Petitioner would then expect the jury to believe him when the defense for the first time claimed a deceased individual had been the shooter. Respondent argues that counsel could have believed that this strategy would have appeared desperate and all too convenient, and it would have undermined the credibility of the defense, especially given the overwhelming evidence of Petitioner's involvement in the crime. In light of this, Respondent posits that defense counsel could have elected instead to build credibility with the jury by admitting to his participation in the crime, but calling into doubt the identity of the actual shooter. This court finds that a rational jurist could find this strategy was possible and not unreasonable.

In any case, even if counsel's strategy was deficient, Petitioner fails to show prejudice. Even if counsel had investigated and obtained these witnesses' testimony, there is no reasonable likelihood that the result would have been different. As pointed out by Respondent, there is little information on these purported witnesses. It is unknown how these individuals are related to Petitioner, whether they had been convicted of any crimes of moral turpitude, or whether they had any biases or prejudices which would have given them reason to fabricate their claims. Furthermore, while they claimed they would have testified if only they had been contacted by defense counsel, they do not explain why they did not come forward and provide this information

to law enforcement. More importantly, none of their testimony would have altered the fact that Officer Rich had testified to observing Petitioner fire directly at him from only a few feet away. And, their testimony would not have called any of the physical evidence connecting Petitioner to the crimes into question. Thus, a fairminded jurist could conclude that there was not a reasonable probability that the outcome would have been different and that the state court rejection of this claim was not unreasonable.

### 5. Claim Five – Prosecutorial Misconduct

Petitioner next argues that the prosecutor committed misconduct by presenting false evidence in the form of testimony from Officers Franklin and Grizoffi. Petitioner points to Officer Kelly's report and alleges the officers testified falsely to cover up the fact that he had been beaten.

### a. AEDPA

Petitioner claims AEDPA does not apply to this claim because it was denied on procedural grounds. Petitioner points to the superior court's order which stated in relevant part: "Petitioner's claims for the most part are conclusionary and speculative and thus fail to state a claim for relief. (In re Swain (1949) 34 Cal.2d 300, 304, cert. denied (1950) 338 U.S. 994) . . . . [¶] . . . [¶] As to some of the claims raised by Petitioner, he failed to assert those claims on direct appeal and has not demonstrated an exception to the general rule that a court will dismiss a habeas petition if it alleges an issue that could have been, but was not raised on direct appeal. (In re Harris (1993) 5 Cal.4th 813, 829)." (LD 19.)

The state court does not specifically state that the Swain or Harris bars applied to this claim. The court only noted that they applied to "some of the claims" or his "claims for the most part." (LD 19.) Thus, it is unknown whether the claim was denied on procedural grounds or on the merits. The court did in fact specifically deny the ineffective assistance of counsel claims on the merits. (LD 19.) In such a case, it is presumed that the state court denied the claim on the merits and AEDPA deference applies. Richter, 562 U.S. at 99-100; Harris v. Reed, 489 U.S. 255, 265 (1989). Nevertheless, even under *de novo* review, it is clear the claim is without merit.

1    b.  Legal Standard

2        A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

3    the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v.

4    DeChristoforo, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial

5    misconduct must be "of sufficient significance to result in the denial of the defendant's right to a

6    fair trial."  Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S.

7    667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the

8    entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The

9    court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged

10   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the

11   aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance

12   of an unfair trial to the accused."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  If prosecutorial

13   misconduct is established, and it was constitutional error, the error must be evaluated pursuant to

14   the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Thompson v.

15   Borg, 74 F.3d 1571, 1577 (9th Cir. 1996) (Only if constitutional error is established "would we

16   have to decide whether the constitutional error was harmless.").

17       The knowing use of false or perjured testimony against a defendant to obtain a conviction

18   is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  In Napue, the Supreme Court held

19   that the knowing use of false testimony to obtain a conviction violates due process regardless of

20   whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when

21   it appeared.  Id. at 269.  The Court explained that the principle that a State may not knowingly use

22   false testimony to obtain a conviction - even false testimony that goes only to the credibility of

23   the witness - is "implicit in any concept of ordered liberty."  Id.

24       To establish a claim under Napue, a petitioner must show that "(1) the testimony (or

25   evidence) was actually false, (2) the prosecutor knew or should have known that the testimony

26   was actually false, and (3) the false testimony was material."  United States v. Zuno-Arce, 339

27   F.3d 886, 889 (9th Cir. 2003).

28       As to the first element, simple inconsistencies in testimony are insufficient to establish

that a prosecutor knowingly permitted the admission of false testimony. <u>United States v. Zuno-Arce</u>, 44 F.3d 1420, 1423 (9th Cir.1995). "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies." <u>Id</u>. Further, "[t]he fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false." <u>United States v. Croft</u>, 124 F.3d 1109, 1119 (9th Cir. 1997).

     c. <u>Analysis</u>

At most, the differences between Officers Franklin and Grizoffi's testimony and what was contained in Officer Kelly's report reflect mere discrepancies and inconsistencies. The record does not show that the officers lied, that the prosecutor knowingly allowed false testimony, or that the prosecutor knowingly allowed the officers to create a misrepresentation of the facts. Franklin and Grizoffi testified that they forcibly removed Petitioner from the trashcan when Petitioner refused to comply. This was consistent with Kelly's report. Franklin and Grizoffi also testified that Petitioner did not comply when they attempted to place him into custody. They stated that Petitioner resisted going to the ground and that he refused to remove his hands from underneath his body, whereupon officers utilized force to move him to the ground, subdue him, and place him into custody. This was also consistent with Kelly's report. The only inconsistency is contained in Officer Franklin's statement that he and Grizoffi were the only two officers involved "with actually putting [Petitioner] into custody." (LD 7 at 245.) It is unclear what he meant by this statement. His statement could have referred to the removal of Petitioner from the trashcan, and it also could have referred to the act of removing Petitioner's hands from underneath him and handcuffing him. Either of these meanings would have been consistent with Kelly's report. According to his report, Kelly stated that Petitioner resisted going to the ground so he "grabbed the back of [Petitioner's] left shoulder area and helped force him down." (LD 22, Ex. H.) When Petitioner continued to resist, Kelly "used his right boot to force him down all the way to the ground." (LD 22, Ex. H.) Franklin and Grizoffi make no mention of Kelly's assistance but their testimony does not contradict Kelly's report. The officers did not testify that they were alone at the scene. Franklin had in fact testified that he, Grizoffi, and other members of the SWAT unit

were searching the area together. Franklin's statement that he and Grizoffi were the only two officers to place him in custody is therefore ambiguous or inconsistent, but it is not demonstrably false. Respondent correctly argues that such ambiguities and inconsistencies are grounds for cross-examination, but they do not constitute a <u>Napue</u> violation. If defense counsel had been concerned with the inconsistencies, he had Kelly's report and could have introduced it to highlight those inconsistencies.

Further, even if the Court were to find the prosecutor committed a <u>Napue</u> violation by not calling Franklin and Grizoffi's testimonies into question, the allegedly false testimony was not material. Under <u>Napue</u>, the petitioner must show a reasonable likelihood that Petitioner was denied a fair trial due to the officers' statements. Even if the officers had admitted that Kelly was present and assisted them in taking Petitioner to the ground, it would not have affected the ultimate issues in the trial: whether Petitioner was the shooter, and whether he intended to kill the officer by firing his weapon at him. Accordingly, Petitioner fails to establish a <u>Napue</u> violation, and he is not entitled to relief.

6. <u>Claim Six – Insufficient Evidence of Attempted Murder</u>

Petitioner claims that there was insufficient evidence of an intent to kill Officer Rich. This claim was raised on direct appeal to the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Velasquez argues that insufficiency of the evidence of intent to kill requires reversal of the attempted murder conviction in count 1.
>
> The elements of attempted murder are (1) a specific intent to murder a human being and (2) a direct but ineffectual act done toward its commission. (*People v. Koontz* (1984) 162 Cal.App.3d 491, 495.) Express malice, of course, is another term for specific intent to kill. (*People v. Lee* (1987) 43 Cal.3d 666, 671.) Reliance on implied malice to sustain a charge of attempted murder is logically impossible since implied malice cannot coexist with express malice. (<u>Id</u>. at p. 670.) On those premises, Velasquez argues there was nothing about the nature and circumstances of the shooting that demonstrated an intent to kill Rich, as he did not aim directly at Rich's body and Rich was not in the likely path of any of the bullets. In response, the Attorney General characterizes the record as one of strong circumstantial evidence of Velasquez's intent to kill Rich based on his actions when robbing the bar and that during the ensuing police pursuit, he stopped to fire multiple shots at Rich.
>
> Even without evidence of motive, the rule is "well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted

21

murder, may in many cases be inferred from the defendant's acts and circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Together, circumstantial and direct evidence shows that, while being pursued by Rich, Velasquez's SUV stopped in the road and when, to avoid a collision, Rich came to a stop within 20 feet of the SUV, Velasquez popped up through the SUV's sun roof facing Rich, pointed the gun "directly at" Rich, and began firing shots, two of which hit the front of the patrol car. As Rich made a U-turn, Velasquez continued to fire, with at least one shot hitting the lower front passenger side door. From Velasquez's actions and Rich's testimony that Velasquez pointed the gun "directly at me," the jury could infer that Velasquez intended to fire at, and kill, Rich. When a defendant does a direct but ineffectual act towards accomplishing a killing with the intent to kill a human being, the completed crime of attempted murder has been committed. As stated in *Smith*, "'The act of firing toward a victim at close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill....'"" (*Smith, supra*, 37 Cal.4th at p. 741.)

Nonetheless, Velasquez argues that because the bullets hit the front of the patrol car, as opposed to the patrol car's window or roof, he was shooting not to kill Rich, but to disable the patrol car so he could escape apprehension. Velasquez likens this case to *People v. Leon* (2010) 181 Cal.App.4th 452 (*Leon*). There, the Court of Appeal found the defendant, who fired one shot at a vehicle containing three people, killing one of them, was properly convicted of the attempted murder of one of the two other occupants of the car, who was directly in the line of fire, but not of the third person, who was out of the line of fire. (*Leon, supra*, 181 Cal.App.4th at p. 465.) Based on *Leon*, Velasquez reasons that because Rich was not in the line of fire of the bullets that hit the patrol car, he could not have intended to kill Rich. The difference between *Leon* and the present case, however, is that here Velasquez fired multiple shots at a single person, not a single shot at multiple persons. Rich testified he saw Velasquez point the gun "directly at" him and fire. Velasquez continued to fire even after Rich turned his vehicle around to head the other way. The fact that the shots missed is of no consequence; the issue of intent is a factual one for the jury. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946.)

Our duty on a challenge to the sufficiency of the evidence is to review the whole record in the light most favorable to the judgment for substantial evidence – credible and reasonable evidence of solid value that could have enabled any rational trier of fact to have found the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318; *People v. Prince* (2007) 40 Cal.4th 1179, 1251.) That standard, which applies to circumstantial and direct evidence alike, requires us to presume in support of the judgment the existence of every fact a reasonable trier of fact reasonably could have deduced from the evidence. (*Prince, supra*, at p. 1251.) By that standard, our review of the record persuades us that a sufficiency of the evidence of intent to kill is in the record. (*Ibid.*) Velasquez's insufficiency of the evidence argument simply asks us to reweigh the facts. That we cannot do. (*People v. Bolin* (1998) 18 Cal.4th 297, 331–333 (*Bolin*).)

Velasquez, 2013 WL 173190, at *2–4.

        a.  Legal Standard

    The law on sufficiency of the evidence is clearly established by the United States Supreme

Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

b. <u>Analysis</u>

In this case, the state courts correctly applied the <u>Jackson</u> standard. Therefore, the question before this Court is whether that application was objectively unreasonable. <u>Williams</u>, 529 U.S. at 412-413. Review of the record reveals substantial evidence supported the finding that Petitioner intended to kill Officer Rich.

During the pursuit, the suspect vehicle stopped in the middle of the street. The officer was forced to stop his vehicle abruptly and within a car length of the suspects. Petitioner then emerged from the sunroof and pointed his gun "directly at" Officer Rich and began firing. Two of the shots hit the police car. Despite the officer's attempt to evade by turning his vehicle completely around, Petitioner continued to fire directly at the officer. Based on Petitioner's actions and the officer's testimony that he watched Petitioner look directly at him while pointing and firing his weapon at him, a reasonable factfinder could have found that Petitioner intended to kill the officer.

There is more than sufficient evidence from which a fairminded jurist could conclude that the state court rejection of his claim was not unreasonable. The claim should be denied.

7. <u>Claim Seven – Cumulative Error</u>

Petitioner claims that the cumulative effect of the errors rose to the level of a constitutional violation. "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." <u>Ceja v. Stewart</u>, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing <u>Mak v. Blodgett</u>, 970 F.2d 614, 622 (9th Cir. 1992)); <u>see also</u> <u>Karis v. Calderon</u>, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. <u>See</u> <u>Rup v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996). In this case, no errors occurred, and hence, there can be no cumulative error. Even if errors occurred, a reasonable factfinder could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

**IV.    RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be

1  DENIED with prejudice.

2      This Findings and Recommendation is submitted to the United States District Court Judge

3  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

4  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

5  twenty-one days after being served with a copy of this Findings and Recommendation, any party

6  may file written objections with the Court and serve a copy on all parties.  Such a document

7  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

8  to the Objections shall be served and filed within ten court days after service of the Objections.

9  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

10  The parties are advised that failure to file objections within the specified time may waive the right

11  to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

12
13  IT IS SO ORDERED.

14      Dated:  **August 4, 2017**                    **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE